UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Arlene Lee,                          :

    Plaintiff,

v.                                   :                    No. 07-cv-532 (AHN)

Verizon Wireless, Inc.,

    Defendant.                       :

<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

This is an employment discrimination case.  Arlene Lee
("Lee"), a female of Korean descent, worked for Verizon Wireless,
Inc. ("Verizon") as a customer service coordinator
("coordinator").  Lee filed this lawsuit against Verizon on April
6, 2007, alleging that Verizon subjected her to "an ongoing
pattern of harassment, discrimination, retaliation and disparate
treatment" because of her gender, ethnicity and race.  Verizon
has filed a motion for summary judgment [doc. # 33] as to all of
Lee's claims.

<u>FACTS</u>

The following facts are undisputed.[1]  Verizon hired Lee, a
female of Korean descent, on April 19, 2001 as a coordinator in

---

[1] Lee failed to deny or admit several of Verizon's 56(a)(1)
statements of material fact.  In some instances, Lee also cited
to portions of her deposition that did not establish disputed
issues of material facts.  Accordingly, those statements are
deemed admitted.  <u>See</u> Local Rule 56(a)(1); <u>see also</u> <u>Holtz v.
Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001) (holding that a
district court has "broad discretion" to refuse to consider "what
the parties fail to point out in their Local Rule 56.1
statements") (internal quotation marks omitted).

its Business Support Center ("BSC") at Verizon's Orangeburg, New York call center. The purpose of the BSC is to provide customer service to Verizon's small and medium business clients and major national accounts. Phone calls from these clients frequently involve such issues as serial number changes, billing questions, plan changes and voicemail password resets.

Lee was hired as an at-will employee. As with all Verizon employees, Lee received initial training after she was hired. As a coordinator, Lee's duties primarily consisted of assisting customers over the telephone with their wireless service questions. Lee was also responsible for assessing and promoting a wide range of Verizon products and services; communicating complex, technical information in a clear and concise manner to both internal and external customers; and interfacing with the computer system and other departments on technical issues.

A. Lee's Transfer to Wallingford

On or about September 16, 2004, as a result of the closing of the Orangeburg call center, Lee voluntarily relocated to Verizon's Wallingford, Connecticut call center. None of Lee's supervisors from Orangeburg transferred with her to the Wallingford office. Upon her transfer to Wallingford, Lee received additional on-the-job training, including training on the Wallingford call center's phone system and additional coaching when her performance warranted it.

Lee did not know all of the employees at the Wallingford call center. Lee drew the conclusion that she was the only Asian or Korean employee at the call center based solely on her own observations and perceptions. Four other employees at the Wallingford call center identified themselves as Asian while Lee was employed there.

Shortly after her arrival in Wallingford, Lee's new supervisors began receiving complaints about Lee from her customers and coworkers. In response, Lee's supervisors coached her on her job responsibilities.

B.    Alleged Discriminatory Incidents

During her first week at the Wallingford call center, a supervisor had Lee's filing drawer moved. Lee alleges this action was discriminatory because the supervisor "didn't do it with anyone else." Lee's supervisor told her that she wanted the drawer moved because it was "in people's way." While Lee disagrees that it was "in people's way," she agrees that if it were, then it might pose a safety and fire hazard.

At one point during her employment in Wallingford, Verizon moved Lee's lunch period and then moved it back. Lee believes this action was discriminatory because "my lunch hour was the only one moved at that time."

Lee offers other instances of alleged discrimination. A supervisor assigned a task to Lee that was not hers to perform.

A supervisor yelled at Lee once for her "poor work performance." Lee does not recall the specifics of the incident but states that it was related to a "bad call." A supervisor moved Lee's seat and would not let her choose her own seat. A supervisor did not give Lee other internal positions at Verizon for which she had applied. Verizon's job policy states that employees who are "on a corrective action or performance improvement plan" are ineligible to seek open positions within the company.

Lee claims that one employee at Verizon's Wallingford location stated about her: "Who does she think she is? Doesn't she know I am from the ghetto?", though Lee could not remember who made the statement. Lee also claims that she was subjected to a disciplinary meeting in February 2005. However, she could not remember the substance of the alleged meeting.

During her employment at the Wallingford call center, Lee also claims that: a supervisor ignored her; a supervisor "looked at her differently"; a supervisor gave Lee a "difficult time" when she asked for her personnel file; supervisor Maureen Luden ("Luden") failed to invite Lee to a department-wide meeting; a supervisor gave other employees new computer monitors but not to Lee; a supervisor sent an email to BSC employees, including Lee, asking what languages they spoke in addition to English; a supervisor criticized how Lee spoke to customers; a supervisor moved Lee's filing drawer and desk. Lee connects these incidents

to her belief that Verizon did not treat its other employees in the same manner.

Another alleged discriminatory incident involved the death of Lee's uncle. A supervisor required proof of the funeral before she would approve her leave to attend, consistent with Verizon's bereavement policy, and accused Lee of lying about the funeral. The bereavement policy allows Verizon employees to receive time off to mourn the loss of an "immediate family member," and provides that "[b]efore approving Bereavement Leave, your supervisor may request confirmation of the death in the form of a death certificate, obituary or other documentation." Even though the funeral was for Lee's uncle, Verizon gave her time off to attend the funeral.[2] Around this time, a supervisor stated that she could not read Lee's uncle's funeral notice, which was written in Korean.

Lee also notes that on one occasion, she and a group of her coworkers received an email from another coworker, asking if any of them wanted to order Chinese food for lunch. Lee found this to be discriminatory because she is allergic to Chinese food. Lee could not remember whether the coworker who sent the email knew of her allergy.

---

[2] Verizon's company policy manual contains a section on bereavement leave, and defines "immediate family member" as a "spouse, domestic partner, parents, grandparents, siblings, children, grandchildren, wards of the court and other family members residing in your home at the time of death."

Lee also alleges that Luden, one of her supervisors at Verizon, yelled at her in front of her coworkers after Lee told Luden that Verizon had not paid her for alleged outstanding overtime work.

The incidents that Lee relies on in support of her claim of retaliation took place prior to November 2004, nine months before she was terminated. Lee also claims that she met with her supervisors and complained about "harassment, discrimination and selective treatment" in February 2005 and that the supervisors threatened her with unwarranted discipline - but now she does not remember the substance of the meeting or what discipline the supervisors threatened to impose on her. When asked about her gender discrimination claim, and whether she was terminated because she was a woman, Lee responded: "To the best of my recollection that I recall, I don't think it's because I was a woman." (Lee Dep. at 194-95).

Lee claims that, as a result of these incidents and her termination, she suffered from Verizon's intentional infliction of emotional distress. Lee never sought any medical treatment of any kind for her alleged emotional distress.

C.    Lee's Warnings and Termination

Because coordinators at Verizon spend most of their workday on the phone with customers, Verizon implemented an "ACD abuse

policy"[3] which prohibits call manipulation and call avoidance by its employees.  "ACD abuse" means any manipulation of the ACD call system that results in either avoiding incoming calls from customers or falsifying statistical data regarding the activity the coordinator is performing.  A byproduct of call avoidance is that the coordinator generates a false "Call Detail Log" that indicates time spent "wrapping up" the call in the "Call Work" function – this function is normally only used after a call to enter further information into the computer system or to handle a change to a customer's account.  Verizon randomly monitors its coordinators to ensure they are abiding by the ACD abuse policy. Any instances of call manipulation or call avoidance violates Verizon's company policy, which was in effect at the time that Lee worked for Verizon.

While at the Orangeburg call center, Lee's supervisor randomly reviewed Lee's call detail log for June 20, 2003 and discovered that Lee had been selecting "outside line" without making a phone call, thus avoiding customers' incoming calls. Lee's supervisor at that time advised her that "this is not the proper procedure if she needs additional time to work on accounts" and "that should she need more time to work on accounts, she can come to me and we can schedule down time." Scheduling down time with a supervisor is required when a

---

[3] "ACD" stands for "automatic call distribution."

coordinator is unable to complete call-related work during the
call, within the allotted three minutes post-call, or during the
half-hour paperwork break each day.

Verizon randomly monitored Lee's call logs at the
Wallingford call center for five days in October 2004. In the
selected logs, Verizon determined that Lee had approximately
seventy-nine instances of call manipulation and avoidance. On
November 15, 2004, Verizon issued a Final Written Warning to Lee.
The Final Written Warning stated that "immediate and sustained
improvement is imperative" and "any further instances . . . will
result in further disciplinary action, up to and including
termination." On the same date, Lee violated Verizon's company
policy and received a Written Warning for leaving company grounds
to go shopping during her paperwork break, which is company-paid
time. Lee admits that she left Verizon's grounds during her paid
paperwork break.

Verizon randomly monitored Lee's call logs again in July
2005. Verizon discovered that Lee had engaged in further call
manipulation and avoidance, including transferring customers back
to the end of the call queue where they previously had been on
hold. Marcia Belford, one of Lee's supervisors, wrote the
following email in July 2005 regarding Lee to Linda Broderick,
the Wallingford call center director:

> I am requesting separation of employment for Arlene
> Lee. We have run random reports which have clearly

indicated call manipulation. We have spoken to Arlene regarding the amount of transfer calls and excessive call work. . . ."

Broderick approved Belford's request, and on July 21, 2005, Verizon terminated Lee.

STANDARD

Summary judgment should be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A disputed issue is not created by a mere allegation in the pleadings, Applegate v. Top Assoc., Inc., 425 F.2d 92, 96 (2d Cir. 1970), or by surmise or conjecture, Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Conclusory assertions also do not

9

create a genuine factual issue.  <u>Delaware & Hudson Ry. Co. v.</u>

<u>Conrail</u>, 902 F.2d 174, 178 (2d Cir. 1990).  Thus, "as to issues

on which the non-moving party bears the burden of proof, the

moving party may simply point out the absence of evidence to

support the nonmoving party's case."  <u>Nora Beverages, Inc. v.</u>

<u>Perrier Group of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998).

DISCUSSION

Lee alleges that Verizon discriminated against her on the

basis of her gender, race and ethnicity and retaliated against

her in violation of Title VII and the Connecticut Fair Employment

Practices Act ("CFEPA").[4]  Lee also alleges that Verizon

intentionally caused her to suffer emotional distress as a result

of its discriminatory and retaliatory actions.  Verizon moves for

summary judgment on all of Lee's claims based on her failure to

provide evidence of any causal connection between either her

gender, race or ethnicity and Verizon's alleged conduct.  Verizon

---

[4] The record reflects that after Lee received a warning,
Verizon's policy stated that she was ineligible to apply to any
advertised, in-house position.  Lee acknowledges this in her
deposition:

    Q:    Okay.  If you were on final written warning, was
          it your understanding that that [sic] status would
          have made you ineligible to apply for internal
          jobs?
    A:    To my understanding, yes.

(Lee Dep. 118).  To the extent that Lee alleges a claim of
disparate treatment or that Verizon failed to promote her based
on her applying to in-house positions, such claims have no
factual support and are therefore without merit.

also notes that, during the seven-month discovery period, Lee has
failed to conduct any discovery in this case.

I.    Discrimination/Retaliation Under Title VII and CFEPA

Lee claims that Verizon's discriminatory and retaliatory
conduct against her is in violation of Title VII and CFEPA.
Verizon argues that Lee was terminated because, even after
numerous training sessions and reprimands, she failed to perform
her job in a satisfactory manner.

The court rules on motions for summary judgment on both
Title VII claims and those arising under CFEPA using the
McDonnell Douglas burden-shifting analysis.  McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802 (1973); Absher v. FlexiInt'l
Software, Inc., No. 3:02cv171, 2005 WL 2416203 at *4 n.2 (D.
Conn. Sept. 30, 2005) (noting that a CFEPA claim is governed by
the same analysis as a Title VII claim).

Under the McDonnell Douglas analysis, the initial burden
belongs to the plaintiff, who must establish a prima facie case
of discrimination.  She must show: (1) she is a member of a
protected class; (2) she was qualified for her position; (3) she
experienced an adverse employment action; and (4) the adverse
action occurred under circumstances giving rise to an inference
of discrimination.  See, e.g., Weinstock v. Columbia Univ., 224
F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas, 411 U.S. at
802).  Once the plaintiff has established these elements, the

11

burden shifts to the defendant, which must offer a legitimate, nondiscriminatory reason for its actions.  See Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  For the case to proceed, "the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.  The plaintiff must produce not simply 'some' evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]."  Weinstock, 224 F.3d at 42.

### A.   Gender Discrimination

In counts three and seven of her complaint, Lee alleges gender discrimination claims against Verizon.  Verizon argues that summary judgment should be granted as to these claims because Lee failed to exhaust her administrative remedies with the Equal Employment Opportunity Commission ("EEOC") and Connecticut's Commission on Human Rights and Opportunities ("CHRO") before filing this lawsuit.  Further, Verizon points out that Lee admitted that none of the alleged discriminatory treatment she experienced was attributable to her gender.

In Lee's affidavit to the CHRO and in her Notice of Charge to the EEOC, Lee failed to allege gender discrimination.  Failure

12

to present a claim to the EEOC (or CHRO) before filing suit means that the district court lacks jurisdiction over the claim and, in this case, the claim is also time-barred. See Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir. 2001) (explaining that "[i]f a claimant has failed to pursue a given claim in administrative proceedings, the federal court generally lacks jurisdiction to adjudicate that claim"); Absher, 2005 WL 2416203 at *4-5 (noting that a claim is time-barred if it is not brought to the EEOC within 300 days and to the CHRO within 180 days).

The only way that a claim that was not brought before the administrative agencies may nonetheless be brought in district court is if the omitted claim is "reasonably related" to the claim properly before the court. See Fitzgerald, 251 F.3d at 359-60. In Brown v. Coach Stores, Inc., the Second Circuit found that, in an employment discrimination case based on race, a claim of disparate impact was reasonably related to a claim of failure to promote. See Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998). The court can find no authority, however, that would allow it to find that claims of discrimination based on Lee's race and ancestry are reasonably related to her gender as well, and Lee points to none.[5]

Indeed, as Verizon points out, Lee testified that the

--------

[5] Lee does not address Verizon's argument regarding her failure to exhaust her administrative remedies.

treatment she experienced had nothing to do with the fact that she was a woman.  In response to Verizon's counsel's question, "Does being a woman have anything to do with the claims in this lawsuit?," Lee replied: "To the best of my recollection and that I could recall, no, being a woman would not have anything to do with that."  The only other reference Lee made to her gender was that she cried in one (or more) of her meetings with Verizon supervisors.  She stated that this was related to gender discrimination because "to me, a woman is weaker that a man; a man is stronger and sturdier."  This statement relates to Lee's own gender perceptions, not those of Verizon.  Therefore, there is no evidence to support a finding that Verizon discriminated against Lee on the basis of her gender; moreover, even if there were such evidence, Lee failed to exhaust her administrative remedies.  Accordingly, summary judgment is appropriate as to counts three and seven of Lee's complaint.

### B.   Race and Ethnicity Discrimination

Verizon moves for summary judgment on counts one, two, five and six of Lee's complaint, in which she claims she suffered disparate treatment at Verizon based on her race and ethnicity. Lee argues that "her heritage and her ethnicity were the persistent targets of [Verizon's] attacks."

Under the McDonnell Douglas analysis, and construing the facts in a light most favorable to the plaintiff, Lee must first

make out a prima facie case of discrimination. See Weinstock, 224 F.3d at 42. Lee claims that she was the only Asian and Korean in the Wallingford call center and that Verizon treated her differently than other similarly-situated employees with respect to its business practices and discipline. However, she offers no evidence to support this claim.

Indeed, the only references to her ethnicity and how it relates to her treatment at Verizon involved coworkers, who did not have a role in reprimanding, warning or terminating her. Lee alleges that one coworker who had never emailed her before, sent her an email regarding ordering Chinese food for lunch. Lee does not allege, however, that this was an insult directed at her ethnicity as an Asian - she simply argues that she is allergic to Chinese food, though she does not know if the coworker who emailed her was aware of her allergy.[6] On other occasions, a few of her coworkers asked her about her nationality, but she does not allege that she was treated unfairly by her coworkers thereafter. These allegations are therefore meritless.

She further complains that she was subjected to warnings and reprimands in front of her coworkers. However, questioning by

---

[6] Lee also alleges that she was discriminated against because she spoke Korean on the phone occasionally and because she was the only Korean at the Wallingford call center. Lee offers no evidence that she was the only Korean at that location, nor does she make any causal connection between these allegations and any treatment she allegedly experienced.

supervisors, manipulation of an employee's workspace and oral or written warnings based on documented company policy violations are not "'materially adverse' actions in the view of a 'reasonable employee'" and constitute, at best, trivial harms which are not actionable.  See Chang v. Safe Horizons, 254 Fed. Appx. 838, 839 (2d Cir. 2007) (citing Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 64 (2006)).  As such, Lee does not adduce sufficient evidence to satisfy the third or fourth prongs of a prima facie case of discrimination under the McDonnell Douglas analysis, but viewing the evidence in the nonmoving party's favor, the court will assume for the purposes of this ruling that she was able to do so.

In response to Lee's allegations, Verizon provides a legitimate, nondiscriminatory reason for her termination - namely, several documented instances of Lee's call avoidance and call log falsification, both in the Orangeburg and Wallingford locations, in addition to leaving company grounds during paid time without permission and numerous complaints from customers. Lee admits that she was not authorized to leave company grounds and can offer no reasonable explanation for her documented call

avoidance on dozens of calls during her employment with Verizon.[7]
Lee's only argument regarding this issue is that if her
performance was as substandard as Verizon claims, it would not
have "rehired" her for the Wallingford location.  There is no
evidence to support that Lee was "rehired" - rather, the
Orangeburg call center closed, and Lee, with one warning in her
file at that time for call avoidance - was invited to transfer to
the new call center.  After she began working in Wallingford,
however, Verizon discovered that she again engaged in call
avoidance and falsification, as demonstrated by the affidavits of
her supervisors and her call logs.

Lee argues that the court can only grant summary judgment on
her discrimination claims if she has provided the court with "no
indication that any evidence exists that would permit the trier
of fact to draw a reasonable inference of pretext."  Meiri v.
Dacon, 759 F.2d 989, 997 (2d Cir. 1985).  In the very case cited
by Lee, the court states the following:

Although it is difficult to measure precisely the

---

[7] The only cognizable reason Lee offers for her call
manipulation and call avoidance was that, in July 2005, her call
adherence level was not being "adjusted."  (Lee Dep. at 254).
She claims that she told her supervisors about this.  Though
Lee's personnel file is filled with emails to and from her
supervisors, she provides no evidentiary support for this
allegation.  However, Lee received mandatory initial training on
the phone system and re-training based on her performance,
including her low adherence levels.  On at least one occasion,
she refused to participate in additional training that her
supervisors offered to her.

> strength or weakness of the inference of
> discrimination, we believe it is clear that the INS
> satisfied its burden of production by proffering a
> **veritable arsenal of undisputed, documented examples of
> Meiri's inappropriate actions at work.** Indeed, the
> overwhelming evidentiary presentation provided an ample
> basis for a trier of fact to find that Meiri's
> discharge was based not upon a discriminatory animus,
> but rather upon an honest belief that her job performance
> simply did not measure up to that required of probationary
> employees.

Meiri, 759 F.2d at 997 (emphasis added). The court went on to

hold that the plaintiff's conclusory allegations that she offered

to rebut the defendant's evidence were insufficient to overcome

summary judgment. See id. at 998 (noting that "[a] party

opposing a motion for summary judgment simply cannot make a

secret of his evidence until the trial, for in doing so he risks

the possibility that there will be no trial") (citing Donnelly v.

Guion, 467 F.2d 290, 293 (2d Cir. 1972)).

Similarly, Verizon offers dozens of instances where Lee's

conduct violated company policies and where she treated her

coworkers and customers poorly. For example, Verizon's call logs

demonstrate the length of time that Lee was on a call, how many

times she transferred a call after only a few seconds, or went on

"unavailable" status a few minutes before lunch, a break, or

first thing in the morning when she arrived at work. Lee

provides no evidence whatsoever to rebut the call logs and what

they represent or the supporting statements of her supervisors.

Moreover, Lee's personnel file is replete with customer and

coworker complaints regarding Lee's "nasty," "rude" and "unhelpful" attitude.  This court must reach the same conclusion as the court in <u>Meiri</u>: Lee's workplace behavior and performance, not Verizon's perceived discriminatory animus, led to her termination.  Verizon has presented a legitimate, nondiscriminatory reason for its actions and Lee has failed to provide any evidence at all that Verizon's reasons for reprimanding and terminating her were pretextual.

Accordingly, the court grants Verizon's motion for summary judgment on counts one, two, five, and six of the complaint.

### C.   <u>Retaliation</u>

Lee claims in counts four and eight that Verizon retaliated against her for complaining about the discriminatory treatment she experienced at work.  Verizon counters that it issued warnings and terminated her based on her substandard performance. Further, Verizon points out that none of Lee's actions amounted to a protected activity and they are temporally unrelated to her termination.

For Lee to avoid summary judgment on her retaliation claims under the CFEPA and Title VII, she must make out a prima facie case, showing: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and adverse employment action."  <u>Feingold v. New York</u>,

366 F.3d 138, 156 (2d Cir. 2004). A "protected activity" refers to "action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). To be a protected activity, "complaints must alert the employer to the specific unlawful conduct complained of. Assertion of unfair treatment must clearly be noted as due to the target being a member of a protected class." Dinice-Allen v. Yale-New Haven Hosp., No. 3:06CV00675 (PCD), 2008 WL 160206 (D. Conn. Jan. 10, 2008).

Here, Lee offers little more than conclusory allegations to support her claims. Lee claims that Verizon "retaliated" against her when supervisors yelled at her on several occasions, moved her office furniture, and after she "complained about harassment, discrimination and selective treatment" in February 2005, Verizon terminated her.

None of Lee's allegations, save the complaints she allegedly made at the meeting in February 2005, fall under the definition of "protected activity" to make out a prima facie case of retaliation. Indeed, Lee states that even after her supervisors issued warnings to her, she still raised her alleged unfair treatment with them in February 2005. However, when asked at her deposition about the February 2005 meeting where she claims she was threatened with further discipline and complained to her supervisors about the discriminatory conduct she had experienced,

Lee could not recall any specific details of the meeting except that she stated she was not "being treated fairly" because she received warnings.

In addition, even if Lee complained at the February meeting, Lee was terminated in July 2005, approximately six months later. To establish a causal connection between an adverse employment action and a protected activity, the plaintiff must produce evidence that the plaintiff's "protected activity was closely followed in time by the adverse action." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Even if the alleged meeting and termination were closer in time, Lee cannot rely on "temporal proximity where 'gradual adverse job actions' commenced prior to the protected activity." See Loris v. Moore, 3:04cv1036(WWE), 2008 WL 3891730, *13 (D. Conn. Aug. 20, 2008). Here, Lee received numerous warnings, reprimands and retraining based on her performance and behavior prior to November 2004, three months before the alleged meeting and nine months before she was terminated. Based on Verizon's evidence of Lee's conduct in Orangeburg, these gradual adverse job actions began even before she moved to the Wallingford call center. In addition, Verizon conducted another round of random monitoring of Lee's calls in late June and early July and determined that Lee was again avoiding and manipulating calls. This was the reason for

her termination.  Accordingly, Verizon's motion for summary
judgment is granted as to Lee's retaliation claims.

        D.    <u>Harassment/Hostile Work Environment</u>

      Verizon argues that even if Lee experienced all of the
conduct she alleges in her complaint, it is insufficient to
amount to harassment that created a hostile work environment.
Lee counters only that "genuine issues of material fact remain"
as to this claim.

      To prevail on a hostile work environment claim under Title
VII and the CFEPA, a plaintiff must show that "the workplace is
permeated with discriminatory intimidation, ridicule, and insult
. . . that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment."  <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S.
17, 21 (1993).  The plaintiff must demonstrate "either that a
single incident was extraordinarily severe, or that a series of
incidents were sufficiently continuous and concerted to have
altered the conditions of her working environment." <u>Cruz v.
Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000) (internal
quotation omitted).  In making this inquiry, the court should
look to the totality of the circumstances, including such factors
as: (1) the frequency of the conduct, (2) its severity, (3)
whether the conduct is physically threatening or humiliating, or
a mere offensive utterance, and (4) whether the conduct

unreasonably interferes with an employee's work performance.
Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see
Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426,
437 (2d Cir. 1999) (adding the consideration of "what
psychological harm, if any, resulted" as a fifth factor),
abrogated on other grounds, Burlington N. and Santa Fe Ry. Co. v.
White, 548 U.S. 53 (2006).  A plaintiff cannot prevail on a
hostile work environment claim based on a workplace that is
merely "unpleasant, harsh, combative or difficult."  Paddock v.
Brockport, 418 F. Supp. 2d 288, 293 (W.D.N.Y. 2000).

Lee argues that she was subjected to a hostile work
environment at Verizon based in part on the following incidents:
After she attended her uncle's funeral, a supervisor asked her
for proof of the funeral; 2) Luden yelled at her for "poor work
performance" and "a bad call;" 3) Luden yelled at her in front of
Lee's coworkers after Lee told her that she had not been paid in
a timely fashion for overtime hours; 4) Luden assigned Lee to
perform a sales task that Lee felt was not within her job
description; and 5) Luden failed to invite her to a department-
wide meeting.

Reprimanding an employee for inappropriate behavior or poor
work performance does not rise to the level of an adverse
employment action, let alone a hostile work environment.  See
generally Chang, 254 Fed. Appx. at 839 (citing Joseph v. Leavitt,

465 F.3d 87, 91 (2d Cir. 2006). Nothing about Lee's allegations involves severe or pervasive conduct, and she has offered no evidence that her allegations have anything to do with being a member of a protected class. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 77 (1998). While Lee may not have appreciated her supervisors' reprimands in the presence of her coworkers, these incidents cannot be the basis for a viable hostile work environment claim. Indeed, Title VII is not a "general civility code," and though it "protects employees from improper discriminatory intimidation[,] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." Oncale, 523 U.S. at 81; Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000).[8]

With respect to her termination, Lee argues that Verizon created a hostile work environment because: 1) Verizon terminated a disproportionate number of Asian and female employees; 2) she

_____

[8] Lee also discusses case law regarding gender-based hostility, though she makes no allegations regarding any gender-specific remarks or incidents except that she cried in a meeting with Verizon supervisors, which she thought made her look weaker than a man, and that another coordinator who transferred from Orangeburg who was male received better treatment from supervisors than she did. Beyond these two conclusory assertions, Lee offers nothing more to support her claim aside from the above-mentioned instances of public reprimands by supervisors. Moreover, any claims of gender discrimination are time-barred and the court lacks jurisdiction over them because Lee failed to exhaust her administrative remedies.

was the only Asian terminated; and 3) eight of the eleven terminated were female and six of the eleven were minorities.  As to Lee's statistical data, Verizon counters that not only are these allegations incorrect, they are insufficient to create a genuine issue of material fact as to a hostile working environment claim.  <u>See, e.g.</u>, <u>NAACP v. Florida Dep't. of Corr.</u>, No. 5:00cv100-Oc-10GRJ, 2002 WL 34420335 at *5 (M.D. Fla. Aug. 23, 2002) ("Statistical evidence alone . . . may never establish a prima facie case of individual disparate treatment," and "where a plaintiff relies upon circumstantial evidence, all four elements of a prima facie case must be established using the <u>McDonnell Douglas</u> framework").  Lee has failed to show that she was terminated for any other reason except for her poor performance.  Accordingly, Lee cannot survive summary judgment on her claim of a hostile work environment.

II.  <u>Intentional Infliction of Emotional Distress</u>

Lee claims that she suffered emotional distress as a result of Verizon's treatment of her.  Verizon counters that its alleged conduct was neither extreme nor outrageous, and Lee cannot prove that she suffered "severe" emotional distress.  Verizon argues that for these reasons, the court should grant its motion for summary judgment on this claim as a matter of law.

To prevail on a claim of intentional infliction of emotional distress, a plaintiff must prove: "(1) that the actor intended to

inflict emotional distress, or that he knew or should have known
that emotional distress was a likely result of his conduct; (2)
that the conduct was extreme and outrageous; (3) that the
defendant's conduct was the cause of the plaintiff's distress;
and (4) that the emotional distress sustained by the plaintiff
was severe." Farrar v. Town Of Stratford, 537 F. Supp. 2d 332,
358 (D. Conn. 2008) (citations omitted).  Whether a defendant's
conduct rises to the level of "extreme and outrageous" is a
question for the court to decide.  Johnson v. Chesebrough-Pond's
USA Co., 918 F. Supp. 543, 552 (D. Conn.), aff'd, 104 F.3d. 355
(2d Cir. 1996).  "Conduct on the part of the defendant that is
merely insulting or displays bad manners or results in hurt
feelings is insufficient to form the basis for an action based
upon intentional infliction of emotional distress."  Mellaly v.
Eastman Kodak Co., 42 Conn. Supp. 17, 19 (1991).  The Connecticut
Supreme Court has held that employees "reasonably should expect
to experience some level of emotional distress, even significant
emotional distress, as a result of conduct in the workplace."
Perodeau v. City of Hartford, 259 Conn. 729, 757 (2002).

    With respect to the level of conduct required to be
considered "extreme and outrageous," this court found that,
although a supervisor's conduct was "belittling, intimidating,
and retaliatory," it was insufficient to meet this standard.
Sebold v. Middletown, No. 3:05-CV-1205(AHN), 2007 WL 2782527, *30

(D. Conn. Sept. 21, 2007). Lee's allegations that she was yelled at in front of coworkers, forced to move her office furniture and provide evidence of her uncle's funeral, while perhaps insulting, do not rise to the level of extreme and outrageous conduct. See Mellaly, 42 Conn. Supp. at 19.

In addition, Lee admits that she has not sought treatment for the alleged emotional distress she suffered. Even if the court found that Verizon's conduct was extreme and outrageous, Lee cannot prove that she suffered "severe" emotional distress. See Gagliardi v. East Hartford Housing Auth., Civ. 3:02CV478 (EBB), 2005 WL 2177078, *14 (D. Conn. Sept. 8, 2005)(granting former employer's motion for summary judgment alternatively on this ground because "[t]here is no indication that the Plaintiff either sought or received treatment by a doctor or mental health professional"). Lee's allegations of emotional distress was that after she was terminated from Verizon she had a "very difficult time" and that occasionally she could not eat "thinking about these situations." These allegations do not rise to the level of severity to withstand Verizon's motion for summary judgment as to this claim.

## CONCLUSION

For the foregoing reasons, Verizon's motion for summary judgment [doc. # 33] is GRANTED as to all of Lee's claims. The Clerk shall enter judgment for Verizon and close the case.

SO ORDERED this 25th day of September 2008, at Bridgeport, Connecticut.

```
_____/s/_____
        Alan H. Nevas
United States District Judge
```